**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

NBT ASSOCIATES, INC.,

      Plaintiff,

v.                                       Case No. 2:10-cv-14108

ALLEGIANCE INSURANCE AGENCY
CCI, INC., an Arizona Corporation, et al.,

      Defendants,

and

ALLEGIANCE INSURANCE AGENCY
CCI, INC., a Michigan Corporation, et al.,

      Counter-Plaintiffs/
      Third-Party Plaintiffs,

v.

NBT ASSOCIATES, INC.,

      Counter-Defendant,

MANAR ABBO,

      Third-Party Defendant.

_____/

**OPINION AND ORDER GRANTING COUNTER-DEFENDANT AND**
**THIRD-PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**AND CANCELLING DECEMBER 14, 2011 MOTION HEARING**

In this dispute arising from a franchisor-franchisee relationship turned sour, the

franchisors have filed a motion for summary judgment on the franchisees' counterclaim

and third-party complaint alleging violations of the Michigan Franchise Investment Law

("MFIL"), Mich. Comp. Laws §§ 445.1501-.1546.  The motion has been fully briefed, and the court determines a hearing to be unnecessary.  *See* E.D. Mich. LR 7.1(f)(2).  Because the franchisees executed a release waiving their right to bring the instant claims in exchange for the franchisors' agreement to waive and defer certain franchise fees, the court will grant the motion.

## I. BACKGROUND

In 2006, Counter-Plaintiff Sarmad Amanoail became interested in opening an insurance agency after discussing the business with his brother, Azal Rofial, and a friend, David Dabish, both of whom had owned or operated an Advasure Insurance Agency ("Advasure") franchise.  (Amanoail Decl. ¶ 3, Dkt. # 64-4; Amanoail Dep. 15:17-16:2, 17:5-18:9, 18:25-19:2, Aug. 16, 2011, Dkt. # 61-2.)  As Amanoail was also considering relocating to Arizona from his home in Grand Rapids, Michigan, he began investigating the possibility of starting an insurance agency in that area.  (Amanoail Dep. 18:10-16.)  Amanoail eventually conveyed his intentions to Counter-Plaintiffs Eivan Shahara and Fadi Kenaya, and they agreed to join in Amanoail's venture.  (*Id.* at 26:8-28:13, 30:15-33:2.)

While Amanoail's plans were developing, a mutual friend introduced him to Third-Party Defendant Manar Abbo, (Amanoail Decl. ¶ 4; Amanoail Dep. 21:23-23:12), the president and sole shareholder of the Advasure franchisor, Counter-Defendant NBT Associates, Inc. ("NBT"), (Abbo Dep. 14:5-6, 28:7-11, Aug. 18, 2011, Dkt. # 64-3).  After discussing with Abbo the expansion of the Advasure franchise to Arizona in multiple meetings, (Amanoail Dep. 24:11-26:11, 35:16-38:12), and completing some training at Dabish's Advasure franchise in Grand Rapids, (*id.* at 39:1-41:6), Amanoail permanently

relocated to Phoenix, Arizona, in October 2006 intending to open Advasure franchises there in the near future, (Amanoail Decl. ¶ 8; Amanoail Dep. 9:11-16).  Abbo made at least one trip to Phoenix after Amanoail's move to help plan for the new agencies and scout potential locations.  (Amanoail Decl. ¶ 9.)

Effective December 18, 2006, Amanoail incorporated Counter-Plaintiffs Allegiance Insurance Agency CCI, Inc., ("AIA One") and Allegiance Insurance Agency CCII, Inc., ("AIA Two") in Michigan.  (AIA One Filing Endorsement, Dkt. # 64-14; AIA Two Filing Endorsement, Dkt. # 64-15.)  On January 18, 2007, Abbo met with Amanoail, Shahara, and Kenaya in Phoenix to execute franchise agreements for the operation of one Advasure franchise by AIA One and another by AIA Two.  (Amanoail Decl. ¶ 11; Abbo Dep. 199:9-16, 200:8-17.)  According to Amanoail, Abbo brought to the meeting four spiral-bound copies of Advasure's uniform franchise offering circular ("UFOC") that had already been filled out and marked with "sign here" stickers, and he, Shahara, and Kenaya signed and notarized the franchise agreements contained therein.  (Amanoail Dep. 403:24-404:1; *see also* Abbo Dep. 199:1-8, 199:14-200:2, 200:20-201:5, 229:1-6.)  Amanoail also provided two $10,000.00 checks to Abbo to cover the initial franchise fees.  (Abbo Dep. 237:1-25.)

Amanoail avers that he, Shahara, and Kenaya first saw Advasure's UFOC at the closing on January 18, 2007.  (Amanoail Decl. ¶ 14; Amanoail Dep. 403:2-8.)  Counter-Defendants dispute this claim, alleging that Abbo delivered the UFOC to Amanoail on December 1, 2006.  This fact, they assert, is evidenced by a UFOC receipt signed by Amanoail and dated December 1, 2006, (Abbo Dep. 173:14-174:18; UFOC Receipt, Dkt. # 61-5), which Abbo claims to have inserted into the bound copy of the AIA One

3

franchise agreement that he kept in his possession after the parties signed it on January 18, 2007, (Abbo Dep. 170:10-173:6; *see also* Resp. Opp'n Mot. Summ. J. 6, Dkt. # 64). Amanoail alleges that he actually signed the receipt on January 18, 2007, when, in the flurry of executing all four franchise agreements, he had failed to notice that Abbo had backdated it to December 1, 2006. (Amanoail Decl. ¶¶ 10, 13-15; Amanoail Dep. 402:16-404:14.) Abbo also claims that he provided Amanoail a copy of the UFOC in the spring or summer of 2006, when Amanoail requested information about Advasure to include in a business proposal he was preparing for the Arizona Department of Motor Vehicles. (Br. Supp. Mot. Summ. J. 2-3, Dkt. # 61; *see* Abbo Dep. 125:11-126:25, 166:9-15.) Amanoail confirms that he requested and received information for this purpose, but he denies that the documents provided by Abbo at that time included the UFOC. (Amanoial Dep. 426:9-429:16.)

AIA One's and AIA Two's Advasure franchises opened in mid-2007, and Amanoail avers that they immediately confronted problems due to an alleged failure of NBT to either secure insurance carriers or advertise on behalf of Advasure in Arizona. (Amanoail Decl. ¶¶ 16-18.) In August or September of 2009, Amanoail contacted Abbo and indicated that he was having difficulty paying the monthly royalties and advertising fees required under the franchise agreements. (*Id.* ¶¶ 19-20.) On September 29, 2009, Amanoail and Abbo executed a "Release Agreement" under which NBT agreed to waive all advertising fees for August 2009 through July 2010, to defer the August 2009 royalty fee, and to "[p]ay[] back" the September 2009 royalty fee. (Release Agreement ¶ 1, Dkt. # 61-16.) In exchange, AIA One and AIA Two released NBT and Abbo from any and all claims it currently had arising from the purchase of the Advasure franchises, (*id.*

4

¶ 2), though Amanoail alleges that he was unaware that the agreement contained a waiver of his right to sue NBT and Abbo, (Amanoail Decl. ¶¶ 22-23).

In June 2010, AIA One and AIA Two stopped making royalty payments to NBT, (Br. Supp. Mot. Summ. J. 4; Resp. Opp'n Mot. Summ. J. viii), and the businesses have ceased operating under the Advasure name, (Amanoail Decl. ¶ 24). On July 30, 2010, NBT sent a notice of default to AIA One and AIA Two charging numerous violations of the franchise agreements. (Notice of Defaults under Franchise Agreements, Dkt. # 61-17.) AIA One and AIA Two responded on September 28, 2010, with a letter demanding cancellation of the franchise agreements and payment of rescission damages due to purported violations of the MFIL. (Demand for Cancellation & Settlement Offer, Dkt. # 61-18.) NBT initiated this lawsuit on October 13, 2010, (*see* Compl., Dkt. # 1), and on November 11, 2010, sent a notice to Amanoail, Shahara, and Fadi terminating the franchise agreements (Notice of Termination of Franchise Agreements, Dkt. # 61-19).

On April 26, 2011, AIA One, AIA Two, Amanoail, Shahara, and Fadi (collectively, "Counter-Plantiffs") filed a counterclaim and third-party complaint against NBT and Abbo (collectively, "Counter-Defendants"), seeking rescission of the AIA One and AIA Two franchise agreements under the MFIL. (Third Party Compl. ¶¶ 29-30, 32-33, Dkt. # 35; Countercl. ¶¶ 26-27, 29-30, Dkt. # 36.) The counter-complaint and third-party complaint allege that Counter-Defendants committed two violations of the MFIL in connection with the sale of the Advasure franchises: (1) making untrue statements of material fact and omitting material facts, in violation of Section 5 of the MFIL, Mich. Comp. Laws § 445.1505; and (2) failing to provide a copy of the UFOC at least ten business days prior to the execution of the franchise agreements, in violation of Section 8 of the MFIL,

5

Mich. Comp. Laws § 445.1508.  (Third Party Compl. ¶¶ 24-26, 28; Countercl. ¶¶ 21-22, 25.)  On September 22, 2011, Counter-Defendants filed the instant motion for summary judgment on Counter-Plaintiffs' MFIL claims.

## II.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When deciding a motion for summary judgment, the court "is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Id.* at 497 (quoting *Anderson*, 477 U.S. at 251-52).  "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [movant] is entitled to a verdict . . . ."  *Anderson*, 477 U.S. at 252.

The party seeking summary judgment has the initial burden of showing the absence of a genuine dispute as to a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmovant, who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the nonmovant must sufficiently allege a fact that, if proven, "would

6

have [the] effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop. L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (alteration in original) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)) (internal quotation marks omitted).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(B). "The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan*, 342 F.3d at 497 (citing *Matsushita*, 475 U.S. at 587).

### III.  DISCUSSION

Counter-Defendants request summary judgment on the counterclaim and third-party complaint, arguing both that Counter-Plaintiffs cannot establish the alleged violations of the MFIL and that the Release Agreement forecloses Counter-Plaintiff's claims. In their response, Counter-Plaintiffs fail to answer Counter-Defendants' challenges to the alleged violation of Section 5 of the MFIL, so Counter-Plaintiffs have forfeited any argument that summary judgment on that claim is inappropriate. *See Brown v. Gojcaj Foods, Inc.*, No. 09-14537, 2011 WL 1980533, at *3 (E.D. Mich. May 20, 2011) ("If a party fails to respond to an argument raised in a motion the court can

7

assume that opposition to the motion is waived and the motion may be granted." (citing
*Humphrey v. U.S. Attorney Gen.'s Office*, 279 F. App'x 328, 331 (6th Cir. 2008))).  As
for the alleged violation of the disclosure requirements contained in Section 8 of the
MFIL, Counter-Plaintiffs waived their right to pursue this claim in the Release
Agreement.  Therefore, the court will grant summary judgment to Counter-Defendants
on the counterclaim and third-party complaint.

Under Michigan law, "[t]he validity of a release turns on the intent of the parties."
*Batshon v. Mar-Que Gen. Contractors, Inc.*, 624 N.W.2d 903, 905 n.4 (Mich. 2001).  "To
be valid, a release must be fairly and knowingly made."  *Skotak v. Vic Tanny Int'l, Inc.*,
513 N.W.2d 428, 430 (Mich. Ct. App. 1994) (per curiam).  "A release is not fairly made
and is invalid if (1) the releasor was dazed, in shock, or under the influence of drugs, (2)
the nature of the instrument was misrepresented, or (3) there was other fraudulent or
overreaching conduct."  *Paterek v. 6600 Ltd.*, 465 N.W.2d 342, 344 (Mich. Ct. App.
1990) (per curiam).  As with all contracts, "[i]f the language of a release is clear and
unambiguous, the intent of the parties is ascertained from the plain and ordinary
meaning of the language."  *Batshon*, 624 N.W.2d at 905 n.4.

The Release Agreement signed by the parties in September 2009 clearly
provides for blanket waiver of any and all claims held by Counter-Plaintiffs against
Counter-Defendants, including claims under the MFIL.  The operative paragraph reads,
in pertinent part:

> Franchisee [defined as AIA One and AIA Two] and Owner [defined as
> Amanoail] . . . hereby absolutely and forever release and discharge the
> Released Parties [defined in part as NBT and Abbo] . . . from any and all
> claims, demands, damages, debts, liabilities, losses, accounts, expenses,
> attorneys fees, liens, causes of action and rights and liabilities of every

> kind and nature whatsoever, . . . which Franchisee now has, owns or
> holds . . . pertaining to, arising out of or in connection with (a) the
> Franchise Agreement, . . . and/or (e) the acts or omissions of any
> Released Parties, all including but not limited to, claims relating to any
> violation of any law, rule or regulation in connection with the Franchisee's
> purchase of its franchise . . . .

(Release Agreement ¶ 2.)  Counter-Plaintiffs allege that Counter-Defendants violated

Section 8 of the MFIL by failing to make required disclosures before the execution of the

franchise agreement.  This clearly constitutes a "claim[] relating to any violation of any

law, rule or regulation in connection with the Franchisee's purchase of its franchise,"

and therefore is encompassed by the plain language of the release.  Thus, under the

unambiguous terms of the Release Agreement, the parties intended to exculpate

Counter-Defendants from liability under Section 8 of the MFIL.

Furthermore, Counter-Plaintiffs have adduced no evidence refuting the

conclusion that the release was fairly and knowingly made.  Though Amanoail claims to

have understood the purpose of the Release Agreement as a release of AIA One and

AIA Two from their obligation to pay certain advertising and royalty fees, (Amanoail

Decl. ¶ 21), the contract clearly highlights the concomitant release of Counter-

Defendants from any and all claims held by the franchisees.  The Release Agreement is

a short, two-page document, the bulk of which is comprised of the paragraph spelling

out the terms of the franchisees' release of its claims.  Additionally, the contract

characterizes the Counter-Defendant's promise to excuse franchisees from the payment

of the designated fees as "good and valuable and sufficient consideration" for the

broader release of franchisees' claims.  (Release Agreement ¶ 1; *see id.* ¶ 2 ("In

9

consideration of the Released Parties . . . to take the action described . . . Franchisee

and Owner . . . release . . . the Released Parties . . . from any and all . . . claims . . . .").)

        Amanoail gives no explanation for his failure to grasp the clear intent of the

Release Agreement, other than an allegation that "Abbo did not inform [him] that by

signing this 'Release Agreement,' [he] was waiving [his] rights to sue NBT or Abbo."

(Amanoail Decl. ¶ 22.)  Given that the terms of the Release Agreement are clear and

unambiguous, this alleged failure to inform falls short of a misrepresentation of the

contract or other fraudulent or overreaching conduct sufficient to impute the validity of

the release.  *See Theisen v. Kroger Co.*, 309 N.W.2d 676, 678 (Mich. Ct. App. 1981)

(per curiam) (upholding validity of plaintiff's release of a slip-and-fall claim against

defendant, even though plaintiff "allege[d] that she did not think that the release would

bar a future lawsuit," when "Plaintiff [did] not allege that defendant's representative

misrepresented the nature of the release").  The fact that Abbo "might not have

understood the full legal import of the release does not abrogate it."  *Id.*  On the

contrary, "[i]t is well established that failure to read an agreement is not a valid defense

to enforcement of a contract."  *Montgomery v. Fid. & Guar. Life Ins. Co.*, 713 N.W.2d

801, 804 (Mich. Ct. App. 2005) (per curiam) (citing, *inter alia*, *Snyder v. Wolverine Mut.*

*Motor Ins. Co.*, 204 N.W. 706, 707 (Mich. 1925)).

        Counter-Plaintiffs present two arguments contesting the legality of the Release

Agreement, both of which are unavailing.  First, Counter-Plaintiffs assert that the

release is invalid under Section 27 of the MFIL, which provides that "[a] requirement that

a franchisee assent to a release, assignment, novation, waiver, or estoppel which

deprives a franchisee of rights and protections provided in this act" is "void and

10

unenforceable if contained in any documents relating to a franchise."  Mich. Comp.

Laws § 445.1527(b).  However, it is highly questionable that the Release Agreement is

a "document[] relating to a franchise" within the meaning of Section 27.  *Id.*  The MFIL's

application is limited to "all written or oral arrangements between a franchisor and

franchisee *in connection with the offer or sale of a franchise.*"  *Id.* § 445.1504 (emphasis

added).  Thus, while Section 27(b) undoubtedly applies when a franchisor requires a

franchisee to release its MFIL claims as a condition of the franchise agreement, it

specifically states that this prohibition "shall not preclude a franchisee, after entering into

a franchise agreement, from settling any and all claims."  *Id.* § 445.1527(b); *cf.*

*Franchise Mgmt. Unlimited, Inc. v. Am.'s Favorite Chicken*, 561 N.W.2d 123, 128 (Mich.

Ct. App. 1997) (describing Section 27(b) of the MFIL as declaring void and

unenforceable "a requirement [*in a franchise agreement*] that a franchisee assent to a

release" (alteration in original) (emphasis added) (quoting Mich. Comp. Laws

§ 445.1527(b))).

        In this case, the franchisees executed the Release Agreement more than two

years after entering the franchise agreement, and the release of their MFIL claims was

made in exchange for the waiver of certain fees they would otherwise be required to pay

under the franchise agreement.  Under these circumstances, the Release Agreement is

akin to a "settl[ement] of any and all claims" rather than a "document[] relating to a

franchise."  Mich. Comp. Laws § 445.1527(b); *see Hill v. D.O.C. Optics Corp.*, Nos.

180042, 181656, 1997 WL 33349404, (Mich. Ct. App. Apr. 18, 1997) (unpublished per

curiam opinion) (upholding under Section 27(b) a release executed more than six years

after the parties entered into the franchise agreement).  Counter-Plaintiffs attempt to

11

avoid this conclusion by arguing that Section 27(b)'s exception is limited to the settlement of claims "*arising under* . . . franchise agreements, as opposed to rights, protections or violations of the MFIL itself."  (Resp. Opp'n Mot. Summ. J. 23.)  This contention is directly contradicted by the plain language of Section 27(b), which expressly allows the "settling [of] *any and all* claims."  Mich. Comp. Laws § 445.1527(b) (emphasis added).

Similarly specious is Counter-Plaintiffs' assertion that permitting releases of the kind at issue here would render Section 27(b) "useless" because "every franchisor would simply sign a franchise agreement, and then subsequently require the franchisee to sign an agreement containing a waiver or release."  (Resp. Opp'n Mot. Summ. J. 23.) Such a scheme to circumvent the MFIL is not in evidence in the present case, where the franchisees agreed to waive their claims in return for a tangible legal benefit, namely, relief from paying franchise fees.  Moreover, the conduct Counter-Plaintiffs warn against likely would be precluded by Section 27(b), as a release executed contemporaneously with a franchise agreement and involving no additional consideration would likely be considered a "document[] relating to a franchise."  Mich. Comp. Laws § 445.1527(b).  Section 27(b) of the MFIL does not bar enforcement of the Release Agreement.

Second, Counter-Plaintiffs maintain that the Release Agreement fails for lack of consideration.  That is, Counter-Plaintiffs contend that, because Counter-Defendants violated Section 8 of the MFIL, they were entitled to rescission of the franchise agreements under Section 31 of the MFIL, *see* Mich. Comp. Laws § 445.1531(1), and, consequently, Counter-Defendants' promise not to collect fees due under those

agreements was "[t]he relinquishment of an invalid claim" that serves as "insufficient consideration where . . . the claimant does not have an honest or reasonable belief in the validity of the claim," *Schram v. Dederick*, 42 F. Supp. 525, 527 (E.D. Mich. 1941). This argument necessarily assumes that Counter-Plaintiffs can establish a violation of Section 8, a proposition that is speculative even now in the midst of litigation; a purported violation could only have been more nebulous in September 2009, when Counter-Plaintiffs were still operating as Advasure franchises and abiding by the franchise agreements. *See Barwin v. Frederick & Herrud, Inc.*, 233 N.W.2d 258, 262 (Mich. Ct. App. 1975) ("Surrender of even doubtful claims upon honest and reasonable belief in the validity of such claims is legal detriment amounting to consideration.")

Regardless, even if Counter-Defendants violated Section 8 in offering to sell the Advasure franchise and executing the franchise agreements, the Michigan Court of Appeals has held that noncompliance with Section 8 does not render a franchise agreement void and unenforceable.  *Maids Int'l, Inc. v. Saunders, Inc.*, 569 N.W.2d 857, 858 (Mich. Ct. App. 1997).  When faced with a Section 8 violation, a franchisee may pursue damages or rescission under Section 31, but the franchise agreement remains in force and effect, at least until it is actually rescinded by a court.  *See id.*  When the parties executed the Release Agreement, Counter-Defendants could seek legal enforcement of their right to collect the fees due under the franchise agreements, so excusing payment of those fees constituted adequate consideration.  Thus, Counter-Plaintiffs validly waived their Section 8 claim under the Release Agreement,[1] and the

---

[1]Only Counter-Plaintiffs AIA One, AIA Two, and Amanoail were parties to the Release Agreement, but Counter-Plaintiffs Kenaya and Shahara do not contest

13

2:10-cv-14108-RHC-MKM   Doc # 69   Filed 12/09/11   Pg 14 of 14   Pg ID 3684

court will grant summary judgment to Counter-Defendants on the counterclaim and

third-party complaint.

## IV.  CONCLUSION

For the foregoing reasons, IT IS ORDERED that Counter-Defendant and Third-

Party Defendant's motion for summary judgment [Dkt. # 61] is GRANTED.

IT IS FURTHER ORDERED that the December 14, 2011 motion hearing is

CANCELLED.

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  December 9, 2011


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, December 9, 2011, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

---

Counter-Defendants' assertion that they are not entitled to pursue claims based on the
MFIL.  (*See* Br. Supp. Mot. Summ. J. 10-11.)  Accordingly, the court will grant summary
judgment against all Counter-Plaintiffs.  *See Brown*, 2011 WL 1980533, at *3.

S:\Cleland\JUDGE'S DESK\C2 ORDERS\10-14108.NBTASSOCS.GrantMotSummJ.set.wpd