**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

NBT ASSOCIATES, INC.,

       Plaintiff,

v.                                    Case No. 10-14108

ALLEGIANCE INSURANCE AGENCY
CCI, INC., et al.,

       Defendants.

_____/

**OPINION AND ORDER DENYING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Before the court is Plaintiff's motion for summary judgment on the second

amended complaint, which alleges numerous claims related to the termination of two

insurance agency franchises formerly operated under the auspices of Defendants. The

motion has been fully briefed, and the court determines a hearing to be unnecessary.

*See* E.D. Mich. LR 7.1(f)(2). Because issues of material of fact exist with respect to

each of Plaintiff's claims, the court will deny the motion.

## I. BACKGROUND

In 2006, Defendant Sarmad Amanoail, who was then living in Michigan, began

investigating the possibility of opening an insurance agency in Arizona. (Amanoail Decl.

¶ 3, Dkt. # 74-2.) Amanoail discussed his plans with his uncle, Defendant Farouk

Kenaya ("Farouk"), his cousin, Defendant Fadi Kenaya ("Fadi"), and another friend,

Defendant Eivan Shahara, all of whom expressed interest in the venture. (Amanoail

Dep. 26:8-28:13, 30:15-33:2 (Aug. 16, 2011), Dkt. ## 72-3 to 72-6.) Meanwhile, a

mutual friend introduced Amanoail to Manar Abbo, the president and sole shareholder of Plaintiff NBT Associates, Inc. ("NBT"). (Amanoail Decl. ¶ 4; Amanoail Dep. 21:23-23:12.) Plaintiff, a Michigan corporation, offers franchises of insurance agencies operating under the name "Advasure," a registered service mark owned by Plaintiff. (*See* ADVASURE, Registration No. 2,960,898, Dkt. # 72-2.)

At some point, Abbo met with Amanoail, Farouk, and Shahara at a restaurant in Troy, Michigan, to discuss expanding the Advasure franchise to Arizona. (Amanoail Dep. 35:16-38:7.) Thereafter, it appears Amanoail began pursuing that goal in earnest. After completing some training at an Advasure franchise in Grand Rapids, Michigan, (*id.* at 39:1-41:6), he permanently relocated to Phoenix, Arizona, in October 2006 with the intent to open two Advasure franchises there in the near future, (Amanoail Decl. ¶ 8; Amanoail Dep. 9:11-16). Effective December 18, 2006, Amanoail also incorporated Defendants Allegiance Insurance Agency CCI, Inc. ("AIA One") and Allegiance Insurance Agency CCII, Inc. ("AIA Two") in Michigan, the two entities that would become the official franchisees of Plaintiff. (AIA One Filing Endorsement, Dkt. # 64-14; AIA Two Filing Endorsement, Dkt. # 64-15.)

Amanoail's preparations notwithstanding, it is unclear the extent to which the individual Defendants, in particular Farouk, remained involved with the insurance businesses. On January 18, 2007, Abbo, on behalf of Plaintiff, and Amanoail, Shahara, and Fadi, on behalf of AIA One and AIA Two, executed "Franchise Agreements" for the operation of one Advasure franchise by AIA One at 3287 East McDowell Road, Phoenix, Arizona, and another by AIA Two at 147 North 27th Avenue, Phoenix, Arizona. (Amanoail Decl. ¶ 11.) As part of that transaction, Amanoail, Shahara, and Fadi also

2

signed two "Personal Guaranty" agreements, (AIA One Franchise Agreement App. D, Dkt. # 74-11; AIA Two Franchise Agreement App. D, Dkt. # 74-12), and Amanoail signed a "Confidentiality/Non-Competition Agreement," (Confidentiality/Non-Competition Agreement, Dkt. # 74-8).  The "Legal Entity Form" signed as an appendix to the franchise agreements reflects that both AIA One and AIA Two are wholly owned by Amanoail (33% interest), Shahara (33% interest), and Fadi (34% interest).  (AIA One Franchise Agreement App. B, Dkt. # 74-6; AIA Two Franchise Agreement App. B, Dkt. # 74-7.)

Plaintiff avers that Farouk was also a "silent" partner in the franchises, pointing to Farouk's deposition testimony to that effect as well as Farouk's indication that Fadi, his son, was somehow standing in for him at the signing of the Franchise Agreements. (Farouk Dep. 21:12-22:3, 86:13-90:18 (Mar. 28, 2011), Dkt. # 72-7.)  This arrangement is further evinced, Plaintiff claims, by the fact that the $10,000 franchise fee for both the AIA One and AIA Two franchises were paid with checks executed by Farouk on behalf of Defendant Power Group Investors, Inc. ("PGI"),[1] (Checks No. 1055, 1056, Dkt. # 72-18), an entity Amanoail and Farouk allegedly created as a "holding company" for several business ventures, including the insurance franchises, (Br. Supp. Pl.'s Mot.

---

[1]Plaintiff's complaint lists "Power Group Investors, Inc., a [sic.] Arizona corporation" as a Defendant to this action.  (2d Am. Compl. 1, Dkt. # 32.)  Defendants point out, however, that PGI is incorporated in Michigan.  (*See* Mich. Dep't of Licensing & Reg. Affairs, *Corporate Entity Details: Power Group Investors Incorporated*, http://www.dleg.state.mi.us/bcs_corp/dt_corp.asp?id_nbr=00185H&name_entity=POWER_GROUP_INVESTORS_INCORPORATED (last visited Feb. 10, 2012), Dkt. # 74-5.) Because the court finds that summary judgment against PGI is otherwise inappropriate, it need not consider at this time Defendants' argument that the failure to name the correct entity defeats Plaintiff's claims against PGI.

Summ. J. 2, Dkt. # 72).  Defendants disagree.  While Farouk discussed with Amanoail the possibility of working together to start insurance agencies, Amanoail testified at his deposition that the partnership actually formed was for the operation of "Express Title and Registration"—a title registration business that Amanoail opened in the same McDowell Road location as AIA One's Advasure franchise.  (Amanoail Dep. 136:16-141:8.)  Defendants also dispute the characterization of PGI as a partnership between Amanoail and Farouk, proffering 2007 and 2008 tax documents from PGI listing Farouk and Shahara as its sole shareholders.  (Defs.' Resp. to Pl.'s Mot. Summ. J. Ex. 3, Dkt. # 74-4.)  In any case, Farouk acknowledged at his deposition that he invested somewhere between $500,000 to $550,000 in both the title registration and insurance businesses.  (Farouk Dep. 22:10-23:6.)  Additionally, proceeds from the operation of AIA One and AIA Two were regularly deposited into a bank account registered to PGI. (Amanoail Dep. 211:7-213:20.)

AIA One's and AIA Two's Advasure franchises opened for business under Amanoail's management in mid-2007,[2] and they apparently struggled from the get-go. Under the Franchise Agreements, Plaintiff was required to both designate the insurance policies that would be offered by the franchises and provide authorized insurance carriers from which the franchises could obtain those policies.  (AIA One Franchise Agreement § 5.7, Dkt. ## 72-9 to 72-10; AIA Two Franchise Agreement § 5.7, Dkt. ## 72-14 to 72-15.)  According to Amanoail, however, Plaintiff had virtually no such

---

[2]It appears that Shahara and Fadi may also have worked at one or both franchises for a time, but the extent to which they were, or remain, involved in the day-to-day operation of the insurance agencies is unclear.  (*See, e.g.*, Farouk Dep. 94:13-95:9, 104:23-105:10.)

insurance carriers in place in Arizona, and he was required to solicit carriers himself. (Amanoail Decl. ¶¶ 16-17.)  Moreover, Amanoail attests, Plaintiff failed to do any advertising on behalf of Advasure in Arizona, despite the fact that Plaintiff collected $500 per month from each franchise as advertising fees.  (*Id.* ¶ 18.)  Because of the expenditures AIA One and AIA Two had to shoulder as a result, Amanoail further alleges, they had difficulties paying the monthly royalty and advertising fees, which, at their peak, totaled $1500 per month for each franchise.  (*Id.* ¶ 19.)  Under the Franchise Agreements, these fees were deducted from the commissions AIA One and AIA Two received from insurance carriers, which the agencies were required to deposit into a trust account controlled by Plaintiff.  (AIA One Franchise Agreement § 4.6; AIA Two Franchise Agreement § 4.6.)

As early as June 2009, Plaintiff avers, Defendants began seeking a larger profit margin by diverting royalties due to Plaintiff.  Specifically, Plaintiff alleges that Defendants started directing insurance carriers to deposit AIA One's and AIA Two's commissions into a bank account within Defendants' control, rather than Plaintiff's trust account.  (Br. Supp. Pl.'s Mot. Summ. J. 4-5.)  In support of this contention, Plaintiff presents an electronic funds transfer authorization, dated June 1, 2009, and apparently signed by Amanoail, authorizing Progressive Insurance to deposit commissions into the Chase Bank account for AIA One and AIA Two.  (Pl.'s Mot. Summ. J. Ex. J, Dkt. # 72-20.)  Defendants deny that this document evinces any unauthorized diversion of commissions; instead, they claim, it was necessary paperwork completed by AIA One and AIA Two in order to carry Progressive Insurance policies.  (Defs.' Resp. to Pl.'s Mot. Summ. J. 5, Dkt. # 74.)

5

AIA One and AIA Two were still having financial difficulties in the fall of 2009, when Amanoail contacted Abbo about the hardship of paying $3000 per month to cover the royalties and advertising fees for both franchises.  (Amanoail Decl. ¶ 20.)  On September 29, 2009, Amanoail and Abbo executed a "Release Agreement" under which NBT agreed to waive all advertising fees for August 2009 through July 2010, to defer the August 2009 royalty fee, and to "[p]ay[] back" the September 2009 royalty fee. (Release Agreement § 1, Dkt. # 75-3.)  In exchange, AIA One and AIA Two released NBT and Abbo from any and all claims it currently had arising from the purchase of the Advasure franchises.  (*Id.* § 2.)

The mounting friction between Plaintiff and the AIA One and AIA Two franchises seems to have come to a head on July 30, 2010, when Plaintiff sent a notice of default directed to Amanoail, Shahara, and Fadi at AIA One's and AIA Two's business addresses.  (Notice of Default Under Franchise Agreements (July 30, 2010), Dkt. # 72-38.)  The notice bases its claim of default in part on Plaintiff's June Commission Reports, which, the notice relates, show that commissions from Gainsco and UAIG—the insurance carriers with which AIA One and AIA Two placed most of their business—had not been received by Plaintiff, but had been sent directly to Defendants.  (*Id.*)  When Defendants failed to respond to these purported defaults in a manner deemed acceptable,[3] Plaintiff initiated this lawsuit on October 13, 2010.  (*See* Compl., Dkt. # 1.)

_____

[3]Plaintiff alleges that it received no response to the default notice.  (Br. Supp. Pl.'s Mot. Summ. J. 7.)  Defendants contradict this assertion with a copy of a response letter dated September 28, 2010, and addressed to the attorney who sent the notice of default on behalf of Plaintiff.  (Letter RE: "Advasure" Franchise Dispute (Sept. 28, 2010), Dkt. # 74-19.)  In the letter, Defendants demand cancellation of the franchise agreements and payment of rescission damages due to purported violations of the

On November 11, 2010, Plaintiff sent a notice terminating the franchise agreements. (Notice of Termination of Franchise Agreements (Nov. 11, 2010), Dkt. # 72-39.)

While Defendants deny that a breach of the franchise agreements occurred, they do acknowledge that, sometime in 2010, the insurance agencies run by AIA One and AIA Two ceased operating under the Advasure name and began doing business as Discount Insurance.  (Defs.' Resp. to Pl.'s Mot. Summ. J. 5.)  Whether this transition occurred before or after the termination of the franchise agreements is contested, as is the date of termination.[4]  To prove that the switch occurred before termination, Plaintiff proffers agency agreements between Discount Insurance and Nations Safe Drivers and Gainsco Auto Insurance, dated October 13, 2010, and November 1, 2010, respectively. (Pl.'s Mot. Summ. J. Ex. O, Dkt. # 72-25; Pl.'s Mot. Summ. J. Ex. K, Dkt. # 72-21.) Those documents contain Amanoail's signature[5] on behalf of "Discount Insurance CC1" and "Discount Insurance CC11" and give the addresses for AIA One's and AIA Two's Advasure franchises.  (Pl.'s Mot. Summ. J. Ex. O; Pl.'s Mot. Summ. J. Ex. K.)

Other evidence brought forth by Plaintiff suggests that the agencies were using Advasure Insurance and Discount Insurance interchangeably for a time in the summer and fall of 2010.  An agency agreement with United Automobile Insurance Company

---

Michigan Franchise Investment Law.  (*Id.*)

[4]On this last point, Plaintiff's implicit position is that termination occurred on November 11, 2010, when it sent the notice of termination to AIA One and AIA Two. (*See* Br. Supp. Pl.'s Mot. Summ. J. 7.)  Defendants aver that they began transitioning out of the Advasure franchise system before that date due to Plaintiff's prior breach of the Franchise Agreements.  (Defs.' Resp. to Pl.'s Mot. Summ. J. 13-14.)

[5]The Gainsco paperwork also lists Fadi as the "licensed agent" of both Discount Insurance agencies.

7

("UAIC"), dated July 29, 2010, references both "Advasure Insurance" and "Discount Insurance."  (Pl.'s Mot. Summ. J. Ex. L, Dkt. # 72-22.)  Similarly, yet another, undated agreement with Mendota Insurance Company shows "Discount Insurance CC1 & CC11" as the "agency name" and "PowerGroup Investors" as the "legal name," but also lists "advasureagency@gmail.com" as the email address.  (Pl.'s Mot. Summ. J. Ex. P, Dkt. # 72-26.)[6]  In September 2010, Plaintiff conducted an investigation of the AIA One and AIA Two agencies, during which they sent individuals into both agencies to purchase insurance policies.  Reportedly, the signage outside both agencies, as well as the receipts received by and policies issued to some of the customers, still read "Advasure Insurance Agency," but other policies listed "Discount Insurance" as the agent.  (Pl.'s Mot. Summ. J. Ex. S, Dkt. # 72-29; Pl.'s Mot. Summ. J. Ex. T, Dkt. # 72-30; Pl.'s Mot. Summ. J. Ex. U, Dkt. # 72-31; Pl.'s Mot. Summ. J. Ex. V, Dkt. # 72-32.)

On the other hand, in the summer of 2010, Amanoail also executed some business documents solely on behalf of Advasure and Allegiance Insurance Agency. An agency agreement with Infinity Insurance Company, dated July 20, 2010, lists PGI as the "producer" and "Advasure Insurance Agency CCI" and "Advasure Insurance Agency CCII" as the relevant agency.  (Pl.'s Mot. Summ. J. Ex. M, Dkt. # 72-23.)  The agencies' professional liability insurance for the period of July 25, 2010, to July 25, 2011, also lists the named insured as "Allegiance Insurance Agency CCI dba Advasure

---

[6]Plaintiff further argues that this document demonstrates Defendants' continued use of the advasureagency@gmail.com email address after Plaintiff terminated the Franchise Agreements.  (Br. Supp. Pl.'s Mot. Summ. J. 5, 7.)  Defendants counter, correctly in the court's view, that the undated character of the document casts doubt on this assertion.  (Defs.' Resp. to Pl.'s Mot. Summ. J. 6, 7.)

Insurance," (Pl.'s Mot. Summ. J. Ex. Y, Dkt. # 72-35; *see also* Pl.'s Mot. Summ. J. Ex. AA, Dkt. # 72-37)—though this was changed to "Power Group Investors, Inc. dba Discount Insurance" effective September 30, 2011, (Pl.'s Mot. Summ. J. Ex. Z, Dkt. # 72-36).  Defendants argue that this evidence shows they did not cease doing business as Advasure Insurance until after receipt of the termination notice, alleging further that Defendant Discount Insurance LLC ("Discount"), was not formed as a Michigan limited liability company until November 19, 2010.  (Defs.' Resp. to Pl.'s Mot. Summ. J. 10.)  While this last averment is unsupported by a citation to the record, it does appear that the only agency agreements entered by Amanoail on behalf of "Discount Insurance LLC" are dated in the spring of 2011.  (Pl.'s Mot. Summ. J. Ex. N, Dkt. # 72-24 (dated Mar. 28, 2011); Pl.'s Mot. Summ. J. Ex. Q, Dkt. # 72-27 (dated Apr. 7, 2011).)

Regardless of when the change occurred, Plaintiff avers that the Discount Insurance Agencies, aside from conducting business on the former premises of the Advasure Insurance Agencies, wrongfully continue to use the telephone numbers assigned to the AIA One and AIA Two franchises and are still associated with the Advasure trademark on various internet sites.  (Amanoail Dep. 365:12-368:8; Search for Discount Insurance LLC 147 N. 27th Avenue, Phoenix, Arizona 85009, http://www.google.com (last visited Jan. 20, 2012), Dkt. # 72-40, at 2; Search for Discount Insurance LLC 3287 E. McDowell Rd, Phoenix AZ 85008, http://www.google.com (last visited Jan. 20, 2012), Dkt. # 72-40, at 3; Search for Advasure Insurance in Phoenix, AZ, http://www.yellowpages.com (last visited Jan. 18, 2012), Dkt. # 72-41, at 2-3.)  Plaintiff also takes issue with the fact that AIA One and AIA

9

Two, while still operating as Advasure franchises, jointly placed advertisements with a competing insurance agency, Above All Insurance.  (Amanoail Dep. 462:17-466:11; Pl.'s Mot. Summ. J. Ex. X, Dkt. # 72-34; *see* AIA One Franchise Agreement § 9.4 ("Franchise Owner must submit to the Company for approval all marketing and promotion materials, including signage, prepared by the Franchise Owner for the Franchise Business and not prepared by or previously approved by the Company."); AIA Two Franchise Agreement § 9.4 (same).)

Defendants do not dispute these allegations, but claim that they do not give rise to any liability to Plaintiff.  Although the parties to the Franchise Agreements executed an "Assignment of Telephone Numbers" purporting to assign AIA One's and AIA Two's telephone numbers to Plaintiff, the space for the telephone number designation is left blank.  (AIA One Assignment of Telephone Numbers & Power of Attorney, Dkt. # 74-16; AIA Two Assignment of Telephone Numbers & Power of Attorney, Dkt. # 74-17.) Consequently, Defendants assert, Plaintiff has no claim to the telephone numbers utilized by the two insurance agencies.  (Defs.' Resp. to Pl.'s Mot. Summ. J. 6.)  As for the internet search results, Defendants deny that "they have any obligation to 'disassociate Advasure from their independent retail insurance agencies on the World Wide Web,'" (*id.* at 7 (quoting Br. Supp. Pl.'s Mot. Summ. J. 7)), and further allege that any link between the former franchise and the Advasure mark on the internet does not result from affirmative action by Defendants, (*see* AIA One Franchise Agreement § 9.3 ("Franchise Owner must not, independently of the Company, use the Internet for promotion of the Franchise Business."); AIA Two Franchise Agreement § 9.3 (same)). Finally, Defendants admit that they collaborated with other insurance businesses to

10

place advertisements, but aver that doing so was rendered necessary by Plaintiff's failure to advertise on their behalf in the Phoenix market. (Defs.' Resp. to Pl.'s Mot. Summ. J. 6.)

On April 22, 2011, Plaintiff filed a second amended complaint alleging a total of ten counts against Defendants based upon these events. Defendants AIA One, AIA Two, Amanoail, Shahara, and Fadi responded on April 26, 2011, by filing a counterclaim against Plaintiff and a third-party complaint against Abbo, alleging violations of the Michigan Franchise Investment Law ("MFIL"). On December 9, 2011, the court granted Plaintiff and Abbo's motion for summary judgment on Defendants' MFIL claims, finding that they had been waived in the Release Agreement executed by Amanoail in September of 2009. Plaintiff filed the instant motion for summary judgment on the complaint on January 20, 2012.

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, the court "is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* at 497 (quoting *Anderson*, 477 U.S. at 251-52). "The judge's inquiry, therefore, unavoidably asks

11

whether reasonable jurors could find by a preponderance of the evidence that the [movant] is entitled to a verdict . . . ." *Anderson*, 477 U.S. at 252.

The party seeking summary judgment has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmovant must sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop. L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (alteration in original) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)) (internal quotation marks omitted).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(B). "The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan*, 342 F.3d at 497 (citing *Matsushita*, 475 U.S. at 587).

12

## III.  DISCUSSION

Plaintiff has moved for summary judgment on the seven substantive claims stated in its complaint[7]: trademark infringement, unfair competition, breach of the AIA One and AIA Two Franchise Agreements, breach of the confidentiality/non-competition provisions of the parties' contracts, unjust enrichment, implied-in-fact contract, and tortious interference with a business relationship.  Plaintiff also seeks to recover its attorney's fees.  After considering each cause of action in turn, the court determines that Defendants, as the nonmovants, have sufficiently "set forth specific facts showing that there is a genuine issue for trial," *see Anderson*, 477 U.S. at 256, in response to Plaintiff's assertion that there existed no genuine dispute with respect to its claims. Summary judgment will therefore be denied.[8]

---

[7]Plaintiff does not address two counts of the complaint in its motion for summary judgment, titled "declaratory relief" and "injunctive relief."  (2d Am. Compl. 37, 38.) Plaintiff appears to assume, as does the court, that these counts are subsumed in the relief Plaintiff requests in connection with the remaining counts.

[8]The court pauses to note that the existence of numerous fact issues would also preclude summary judgment in Defendants' favor, had Defendants filed a summary judgment motion or if the court were inclined to consider the matter independently of Plaintiff's motion.  *See* Fed. R. Civ. P. 56(f)(1) ("After giving notice and a reasonable time to respond, the court may grant summary judgment for a nonmovant . . . .").

13

## A.  Trademark Infringement and Unfair Competition

Plaintiff first argues that summary judgment is warranted on its federal claims of

trademark infringement and unfair competition[9] against all Defendants.  The applicable

standard for these claims has been described by the Sixth Circuit as follows:

> The Lanham Act prohibits the unauthorized use of a registered trademark when selling or advertising a good or service using the trademark is likely to confuse or deceive consumers. In order to defeat summary judgment in a Lanham Act case alleging violations of sections 32 [trademark infringement] and 43 [unfair competition], defendants must raise a genuine issue of fact as to (1) whether their use of the trademark was without the registered owner's consent, or (2) whether their unauthorized use was likely to cause confusion in the marketplace as to the origin or sponsorship of the product.

*U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1188-89 (6th Cir. 1997)

(citing 15 U.S.C. §§ 1114(1)(a), 1125(a)).

Plaintiff's request for summary judgment fails at the first prong, requiring a

showing that Defendants engaged in unauthorized use of the Advasure mark.[10]  *See*

*Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 626 (6th Cir. 1996) (explaining

---

[9]In addition to these federal causes of action, Plaintiff also requests relief for a claim of unfair competition under Michigan common law.  Because "the applicable standard under Michigan common law is the same as the tests for federal trademark infringement and federal unfair competition under 15 U.S.C. §§ 1114(1) and 1125(a)," *Microsoft Corp. v. Compusource Distribs., Inc.*, 115 F. Supp. 2d 800, 807 (E.D. Mich. 2000) (citing *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1105 n.1 (6th Cir. 1991)), the court need not separately evaluate this contention.

[10]"[A] claim of unfair competition, unlike a claim of trademark infringement, does not require that a defendant use the plaintiff's trademark." *Bird v. Parsons*, 289 F.3d 865, 877 (6th Cir. 2002).  Nevertheless, because Plaintiff's allegations relate to Defendants' alleged use of its trademark "rather than any other actions that might have misled the public,"  Plaintiff's claims of both trademark infringement and unfair competition fail unless Defendants "actually used [Plaintiff's] trademark in a prohibited manner."  *Id.*

that likelihood-of-confusion analysis is not necessary in absence of defendant's use of protected mark, of some deceptively similar variant of that mark, or of false or misleading representation).  On this front, Plaintiff claims Defendants Discount, PGI, and Farouk impermissibly used the Advasure mark prior to November 11, 2010—the date Plaintiff sent notice terminating the AIA One and AIA Two Franchise Agreements—while Defendants AIA One, AIA Two, Sarmad, Fadi, Shahara, PGI, and Farouk unlawfully continued to use the Advasure mark after November 11, 2010.[11] There remains, however, genuine disputes of material fact regarding these allegations.

### 1. Actionable Use Before November 11, 2010: Defendants Discount, PGI, and Farouk

Plaintiff contends that Defendants Discount, PGI, and Farouk used the Advasure trademark without Plaintiff's consent because "Defendant Discount, by and through Farouk and PGI, . . . began operating as a retail insurance agency at each of the Advasure Insurance Agency Franchises at issue in this litigation" prior to the termination of the AIA One and AIA Two Franchise Agreements.  (Br. Supp. Pl.'s Mot. Summ. J.

---

[11]Plaintiff in its reply argues that Defendants "distorted the facts and circumstances" surrounding their use of the Advasure trademark by asserting that "the timeline for the operation of the AIA One and AIA Two Franchise [sic] could be broken in two: the time prior to termination and the time after to [sic] termination of the Franchise Agreements."  (Pl.'s Reply to Defs.' Resp. 4, Dkt. # 75.)  "In reality," Plaintiff continues, "there was a significant period of overlap where Defendants were operating as an Advasure Insurance Agency and Discount Insurance *concurrently*," and "Plaintiff is entitled to damages stemming from the overlap in the businesses."  (*Id.* at 5.)  The court agrees in principle with this representation of the facts, however, it was *Plaintiff*, not Defendants, who bifurcated the trademark-infringement and unfair-competition claims.  By seeking summary judgment against only certain Defendants for activities prior to November 11, 2010, and other Defendants for post-termination uses, Plaintiff forces the court to consider the alleged unauthorized use only to the extent that Plaintiff seeks to hold each Defendant liable for it.

11.)  In the course of these operations, Plaintiff avers, "Discount utilized the [Advasure] Marks on storefront signage and advertisements."  (*Id.* at 12).[12]

Despite Plaintiff's assertion that these facts are undisputed, an examination of the record reveals that it is far from clear when Discount coalesced into an entity separate from AIA One and AIA Two.  While Plaintiff produced documents referencing "Discount Insurance" dated as early as July 29, 2010, and the results of Plaintiff's September 2010 investigation suggests that the agencies were identifying themselves to the public as both "Advasure Insurance" and "Discount Insurance," Defendants allege that Discount Insurance, LLC—the named Defendant—was not incorporated until November 19, 2010, and no documentary evidence lists Discount Insurance, LLC, as a relevant entity until the spring of 2011.  These facts call into doubt Plaintiff's ability to hold Discount liable for any alleged infringement that occurred prior to the termination of the franchise agreements.  *See Durray Dev., LLC v. Perrin*, 792 N.W.2d 749, 753 n.1 (Mich. Ct. App. 2010) (noting that, under the Michigan Limited Liability Act, "a limited liability company does not exist until the state administrator endorses the articles of organization with the word 'filed'" (citing Mich. Comp. Laws § 450.4104(2), (6))); *cf. Campbell v. Rukamp*, 244 N.W. 222, 223 (Mich. 1932) (acknowledging that, when

---

[12]Plaintiff also takes issue with other supposed conduct of Discount, namely: "receiving commission checks directly from insurance carriers and depositing them into the Discount/PGI account," (Br. Supp. Pl.'s Mot. Summ. J. 11); "utiliz[ing] the Advasure Franchise System put in place by Plaintiff at the McDowell Road and 27th Avenue, Phoenix, Arizona franchise locations," (*id.* at 12); and "utiliz[ing] the Advasure telephone numbers at each location," (*id.*).  What Plaintiff does not explain is how any of these activities, if they occurred, involve the use in commerce of the Advasure mark.  *See infra* Section III.A.2 (rejecting argument that retention of the Advasure franchises' telephone numbers after termination of the Franchise Agreements is actionable use under the Lanham Act).

company never "reached the stage of being a de jure or de facto corporation, [it] could not exercise any corporate powers, assert corporate rights, or assume corporate liabilities").

There is even less to link Farouk and PGI to the evidence of purported infringement Plaintiff has produced.  Even assuming that Farouk and PGI could be considered agents of Discount, AIA One, or AIA Two, Plaintiff cannot hold Farouk or PGI individually liable for the alleged infringement without showing that they had "direct involvement" or "actively participated" in it.  *See Hair Assocs., Inc. v. Nat'l Hair Replacement Servs., Inc.*, 987 F. Supp. 569, 590-91 (W.D. Mich. 1997).  The only evidence showing any association between Farouk or PGI and the agencies' use of the Advasure marks is the undated agreement with Mendota Insurance Company that identifies the "legal name" of "Discount Insurance CC1 & CC11" as "PowerGroup Investors" and its email address as "advasureagency@gmail.com."  (Pl.'s Mot. Summ. J. Ex. P.)  This is not enough to show that PGI sanctioned, or even acquiesced in, any unauthorized use of the Advasure mark.  *Cf. Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 (1982) ("[I]f a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit.").  The agreement was executed by Amanoail, and there is conflicting evidence as to whether he was affiliated with PGI.  Moreover, it is not evident that reproduction of the Advasure mark in an agency agreement would be actionable under the Lanham Act as a "use in commerce."  15 U.S.C. § 1114(1)(a); *accord* 15 U.S.C. § 1125(a)(1).  According to

17

Defendants, such agreements are essentially supply contracts between an agency and an insurance carrier and are not seen by consumers.

This is not to say, however, that Plaintiff has failed outright to produce any evidence of a potentially infringing use of the Advasure mark prior to termination of the Franchise Agreements.  On the contrary, the results of Plaintiff's September 2010 investigation appear to evince just that.  (*See* AIA One Franchise Agreement § 6.2 ("Franchise Owner must use the Marks only in connection with the operation of the Franchise Business pursuant to the System and only in the manner specified in this Agreement or by the Company.  The Franchise Business must be operated under the Marks and under no other name or mark."); AIA Two Franchise Agreement § 6.2 (same).)  Nevertheless, fact issues exist as to the extent to which these Defendants—Discount, PGI, and Farouk—were involved in these activities, thereby precluding summary judgment on the grounds advanced by Plaintiff.

### 2.  Actionable Use After November 10, 2010:
### Defendants AIA One, AIA Two, Amanoail, Fadi, Shahara, PGI, and Farouk

Plaintiff also avers that several Defendants continued using the Advasure mark in a number of ways after the termination of the Franchise Agreements.  First, Plaintiff points to Defendants' retention and uninterrupted use of the telephone numbers formerly used by AIA One and AIA Two when operating the Advasure franchises.  Although this may be a violation of the Franchise Agreements, (*see* AIA One Franchise Agreement § 7.7; AIA Two Franchise Agreement § 7.7), Plaintiff fails to explain how it constitutes use in commerce of the Advasure mark.  A competitor's use of a "vanity telephone number"—that is, a "toll-free telephone number[] consist[ing] of easy to

18

remember words, where each letter represents a number on the telephone key pad"—may constitute infringement. *Bird*, 289 F.3d at 878; *see also Holiday Inns*, 86 F.3d at 623 n.5 (assuming plaintiff has trademark rights in 1-800-HOLIDAY phone number). Here, in contrast, there is no indication that the AIA One and AIA Two telephone numbers had any significance beyond their function of "direct[ing] a telephone signal to the proper endpoint." *Bird*, 289 F.3d at 878. Use of such generic telephone numbers is not actionable trademark infringement or unfair competition. *See Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 856 (3d Cir. 1992) (holding that mark corresponding to telephone number is entitled to trademark protection only to extent that it serves as "an indicator of source, sponsorship, approval or affiliation" (internal quotation marks omitted)).

Second, Plaintiff complains that Defendants "have taken no steps to remove their insurance businesses . . . from affiliation with Plaintiff's Advasure marks and business affiliations on the World Wide Web." (Br. Supp. Pl.'s Mot. Summ. J. 13.) Defendants are correct, however, that the evidence of this purported use—which includes Google search results, Google Map search results, and Yellow Pages search results—is lacking in one crucial respect: there is no indication that Defendants took any action to associate their businesses with the Advasure mark on these web pages. Use of service mark in advertising, including "listing the name of the business, including the mark, in telephone directories and placing listings and advertisements in the yellow pages," does qualify as use of a mark in connection with offering services for sale. *Lloyd's Food Prods., Inc. v. Eli's, Inc.*, 987 F.2d 766, 768 (Fed. Cir. 1993). Defendants expressly disclaim, however, that the search results proffered by Plaintiff are a product of their

efforts to place listings or advertise on the internet.  If anything, Defendants maintain, any web pages affiliating their agencies with Advasure must have been set up by Plaintiff, given that the Franchise Agreements expressly prohibited them from using the internet for promotion of the franchised businesses.  (*See* AIA One Franchise Agreement § 9.3; AIA Two Franchise Agreement § 9.3.)  If Defendants' allegations are true, and Plaintiff makes no attempt to refute them, the court cannot conclude that Defendants are wrongfully maintaining an internet presence utilizing Plaintiff's mark. *See Lucky's Detroit, LLC v. Double L Inc.*, No. 09-14622, 2012 WL 219418, at *7 (E.D. Mich. Jan. 25, 2012) (finding no evidence of use in commerce of mark based upon Google search results, when there was no indication "that establishments listed as using the mark had to pay Google to be listed or perform some other affirmative act"); *cf. Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 698 n.7 (6th Cir. 2003) (finding no infringing use when internet search for plaintiff's protected mark returns defendants' web page, when plaintiff "offered no proof that defendants did anything nefarious" to cause search results).

Third and finally, Plaintiff alleges that Defendants "have continued to utilize the Advasure name and agency codes."  (Br. Supp. Pl.'s Mot. Summ. J. 13.)  There is simply no evidence in the record to support this averment.  The only post-November 11, 2010, documents presented to the court—aside from the internet search results discussed above—are agency agreements with Statewide Insurance Corp. and Pacific Speciality Insurance Co., neither of which contain any mention of Advasure.  (*See* Pl.'s Mot. Summ. J. Ex. N; Pl.'s Mot. Summ. J. Ex. Q.)  Plaintiff has not established that Defendants were still using the Advasure mark, in commerce or otherwise, after

20

termination of the Franchise Agreements.  Consequently, the court cannot grant

summary judgment for trademark infringement or unfair competition based on the

alleged conduct.

### B.  Breach of the Franchise Agreements

Plaintiff next contends that Defendants AIA One and AIA Two breached the

Franchise Agreements in a number of ways, including "failing to report sales and

commissions of insurance products," "failing to tender payments for royalty fees and

advertising fees," "failing to deposit commissions received in the NBT controlled trust

account," and "entering into an advertising co-op with [a competing] insurance agency."

(Br. Supp. Pl.'s Mot. Summ. J. 22.)  Furthermore, Plaintiff asserts that Defendants

Amanoail, Shahara, and Fadi are jointly and severally liable for the damages resulting

from these breaches, based upon their execution of a "Personal Guaranty" covering the

obligations set forth in the AIA One and AIA Two Franchise Agreements.  (*See* AIA One

Franchise Agreement App. D; AIA Two Franchise Agreement App. D.)

While Defendants do not contest Plaintiff's allegations of breach, they counter

that Plaintiff was the first to breach the Franchise Agreements, thereby precluding it

from holding any Defendant liable for a subsequent breach.  Under Michigan law, "[h]e

who commits the first substantial breach of a contract cannot maintain an action against

the other contracting party for failure to perform."  *Ehlinger v. Bodi Lake Lumber Co.*, 36

N.W.2d 311, 316 (Mich. 1949) (internal quotation marks omitted).  A substantial breach

is one that effects "such a change in essential operative elements of the contract that

further performance by the other party is thereby rendered ineffective or impossible,

such as the causing of a complete failure of consideration or the prevention of further

performance by the other party." *McCarty v. Mercury Metalcraft Co.*, 127 N.W.2d 340,

343 (Mich. 1964) (citation omitted).

Defendants aver that Plaintiff breached the Franchise Agreements by "fail[ing] to

ensure that there were any insurance carriers in place for AIA One and AIA Two to sell

insurance policies in Arizona." (Defs.' Resp. to Pl.'s Mot. Summ. J. 17; *see* Amanoail

Decl. ¶¶ 16-17.)[13]  This allegation, if true, does point to a prior substantial breach by

Plaintiff.  Section 5.7 of the Franchise Agreements requires Plaintiff to "designate the

products and services to be offered by the Franchise Business" and "provide sources of

supply for all authorized products."  (AIA One Franchise Agreement § 5.7; AIA Two

Franchise Agreement § 5.7.)  A franchisee is prohibited from selling insurance products

or services that are not approved by Plaintiff, (*see* AIA One Franchise Agreement § 8.6;

AIA Two Franchise Agreement § 8.6), nor can a franchisee offer for sale any products

of an insurance carrier that is not an authorized by Plaintiff, (*see* AIA One Franchise

Agreement § 8.5; AIA Two Franchise Agreement § 8.5).  Thus, if Plaintiff indeed

neglected to authorize any insurance carriers whose products AIA One and AIA Two

could sell in Arizona, Plaintiff would be left unable to conduct business in accordance

with the Franchise Agreements.

─────────────────

[13]Defendants also claim that Plaintiff breached the Franchise Agreements by failing to advertise for Advasure Insurance in the Arizona market.  Nothing in the language of the Franchise Agreements, however, obligates Plaintiff to place advertisements in a franchisee's market.  In fact, the Franchise Agreements expressly disavow such a requirement: "The advertising and administrative fee payable by Franchise Owner . . . will be used in the Company's sole discretion for advertising and administrative expenses . . . . The Company is not required to spend fees received from Franchise Owner to place advertising in Franchise Owner's market or in any specific media."  (AIA One Franchise Agreement § 9.1; AIA Two Franchise Agreement § 9.1.)

Plaintiff unsuccessfully tries to avoid this defense by arguing that it is precluded by the Release Agreement signed by Amanoail in September of 2009.[14]  The court has previously held that the release precludes Defendants' counterclaims against Plaintiff and Abbo.  (See Order Grant. Counter-Def. & Third-Party Def.'s Mot. Summ. J., Dec. 9, 2011, Dkt. # 70.)  However, nothing in the language of the release prevents Defendants from asserting Plaintiff's alleged breach of the Franchise Agreements as a *defense* to Plaintiff's claims, as it released Plaintiff only "from any and all *obligations, actions, proceedings, losses, costs, claims, demands, damages, debts, liabilities, losses, accounts, expenses, attorneys fees, liens, causes of action and rights and liabilities*" arising from the Franchise Agreements.  (Release Agreement § 2 (emphasis added).)  Moreover, the Franchise Agreements remained in effect—and were ostensibly breached by Plaintiff's alleged failure to designate insurance products and services and authorize insurance carriers—for several months after the execution of the release, but potentially before any breach by Defendants occurred; although Plaintiffs allege that Defendants began diverting commission deposits from the NBT-controlled trust fund as early as June 2009, Defendants dispute this date, and it appears that Plaintiff did not

---

[14]Plaintiff also responds with analysis as to why its actions did not violate Section 5.8 of the Franchise Agreements, which provides that "[t]he Company will negotiate and enter into contracts with such insurance carriers as the Company deems appropriate and in the best interests of the Franchise System."  (AIA One Franchise Agreement § 5.8; AIA Two Franchise Agreement § 5.8.)  In essence, Plaintiff seems correct that the Franchise Agreements contemplate a duty of the franchisee to enter into sub-agent agreements with authorized insurance carriers.  (See AIA One Franchise Agreement § 8.5 ("Franchise Owner may be required to sign a separate agent, subagent or contracted producer agreement with that person or the Company."); AIA Two Franchise Agreement § 8.5 (same).)  Nevertheless, this does not defeat Defendants' allegation that Plaintiff also violated Section 5.7.

consider Defendants' actions as rising to the level of a material breach until the default

notice was sent on July 30, 2010.  Accordingly, because Defendants have shown a

genuine issue of material fact regarding whether they have a meritorious defense to

Plaintiff's allegations of breach, summary judgment is not warranted on Plaintiff's claim

under the Franchise Agreements.[15]

### C. Breach of the Confidentiality/Non-Competition Provisions

Plaintiff also seeks summary judgment on its claim that Defendants AIA One, AIA

Two, Amanoail, Shahara, and Fadi breached "the non-competition/confidentiality

provisions of the related AIA One and AIA Two Franchise Agreements and separate

agreements."  (Br. Supp. Pl.'s Mot. Summ. J. 26.)  The Franchise Agreements prohibit

AIA One and AIA Two—as the Franchise Owners—and Amanoail, Shahara and

Fadi—as owners of AIA One and AIA Two—from engaging in "a business that is similar

to or in competition with" Plaintiff and is located within a fifteen-mile radius of the

franchise location.  (AIA One Franchise Agreement § 11.2; AIA Two Franchise

Agreement § 11.2.)  While it would appear that the continued operation of the two

businesses as Discount Insurance agencies may violate this provision, Plaintiff would be

---

[15]In addition to Plaintiff's inability to prevail as a matter of law on the merits of this
claim, the amount of damages it seeks to recover is not supported by the evidence in
the record.  In its "Itemization of Money Damages," Plaintiff estimates, without
explanation, that the monthly royalty and advertising fee for the life of the Franchise
Agreements would be $2000 for AIA One and $4000 for AIA Two.  On the other hand,
Amanoail's uncontested testimony, confirmed by the terms of the Release Agreement,
reflects that each franchise was paying only $1500 in such fees, at least through
September of 2009.  Additionally, Plaintiff claims $12,000 from AIA One and $24,000
from AIA Two as "back charge of past waived royalty [and] advertising," again without
any indication of how it arrived at these totals.  Thus, even if summary judgment was
appropriate on Plaintiff's claim for breach of the Franchise Agreements, there would still
be an issue of material fact with respect to damages.

prevented from insisting upon its enforcement if, as discussed above, Defendants can prove that Plaintiff was the first to materially breach the Franchise Agreements.

Plaintiff also relies upon a Confidentiality/Non-Competition Agreement executed by Amanoail as "an employee or trainee of [NBT] or one of its affiliates or franchisees." (Confidentiality/Non-Competition Agreement 1.)[16] Although Plaintiff neglects to describe with any particularity how Amanoail is supposed to have breached this contract, it seems that Amanoail potentially violated the provision against "divert[ing] or attempt[ing] to divert any business or customer of an Advasure Insurance Agency to any competing business by direct or indirect inducements or otherwise," either while AIA One and AIA Two were still operating Advasure franchises and/or when they continued doing business as Discount Insurance after the termination of the Franchise Agreements. (Confidentiality/Non-Competition Agreement § 2(a).) Nevertheless, absent additional analysis and evidence from Plaintiff, the court cannot definitively conclude that a breach occurred. There are simply too many unknowns surrounding the operation of AIA One and AIA Two during the months leading up to the termination of the Franchise Agreements to ascertain whether Amanoail diverted business from the Advasure Insurance Agencies. After termination, it is unclear whether Amanoail's continued operation of the two agencies as Discount Insurance can be deemed a diversion of

---

[16]In their response, Defendants convey their impression that Plaintiff also seeks to hold Shahara and Fadi to the Confidentiality/Non-Competition Agreement. The court does not so interpret Plaintiff's claim. Although Plaintiff does argue that Shahara and Fadi, along with AIA One and AIA Two, should be accountable for breach of the non-competition provisions in the Franchise Agreements, Plaintiff explicitly recognizes that Amanoail alone executed the Confidentiality/Non-Competition Agreement. (*See* Br. Supp. Pl.'s Mot. Summ. J. 24.)

25

business from an Advasure Insurance Agency, as there were no other Advasure franchises in the Phoenix area after AIA One's and AIA Two's franchises became defunct.  Given these fact issues, Plaintiff is not entitled to summary judgment against Amanoail based on the Confidentiality/Non-Competition Agreement.

Moreover, in order to enforce the non-competition provisions of either the Franchise Agreements or the Confidentiality/Non-Competition Agreement, Plaintiff must first prove their reasonableness.  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 546 n.2 (6th Cir. 2007).  The Michigan Antitrust Reform Act generally prohibits any "contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce," Mich. Comp. Laws § 445.772, but makes an exception for agreements not to compete that are "reasonable as to . . . duration, geographical area, and the type of employment or line of business," *id.* § 445.774a(1); *Bristol Window & Door, Inc. v. Hoogenstyn*, 650 N.W.2d 670, 679 (Mich. Ct. App. 2002) (concluding that Michigan legislature's enactment of section 445.744a demonstrates "intent to revive the common-law rule . . . that the enforceability of noncompetition agreements depends on their reasonableness").  "This reasonableness inquiry is 'inherently fact specific.'" *Certified Restoration*, 511 F.3d at 547 (quoting *Capaldi v. LiftAid Transp., L.L.C.*, No. 267981, 2006 WL 3019799, at *5 (Mich. Ct. App. Oct. 24, 2006) (unpublished per curiam opinion); *N. Mich. Title Co. v. Bartlett*, No. 248751, 2005 WL 599867, at *3 (Mich. Ct. App. Mar. 15, 2005) (unpublished per curiam opinion)).  Plaintiff has offered no evidence as to the reasonableness of the relevant non-competition provisions, and it cannot prevail on its claim until it does so.  Thus, the court cannot grant summary judgment against any of

26

the Defendants for breaching the non-competition provisions of the Franchise

Agreements and the Confidentiality/Non-Competition Agreement.

### D.  Unjust Enrichment, Implied-in-Fact Contract, and Tortious Interference with a Business Expectancy

Plaintiff also asserts that it can recover from Defendant Farouk for the alleged

breaches of the Franchise Agreements and Plaintiff's resulting losses, advancing three

different legal theories for holding Farouk so accountable: (1) Farouk was unjustly

enriched by Plaintiff's execution of the Franchise Agreements with AIA One, AIA Two,

Amanoail, Shahara, and Fadi, resulting in a contract implied in law; (2) Plaintiff and

Farouk intended to be bound by the terms of the Franchise Agreements, giving rise to a

contract implied in fact; and (3) Farouk unjustifiably urged Amanoail to breach the

Franchise Agreements, making him liable in tort for interfering with Plaintiff's business

relationship with AIA One and AIA Two.  Because Farouk's involvement in and

relationship to AIA One and AIA Two is riddled with uncertainty, summary judgment on

these claims is easily denied.

Plaintiff first avers that Farouk is jointly and severally liable for breaches of the

Franchise Agreements through either an implied-in-law or an implied-in-fact contract.

"A contract may be implied in law where there is a receipt of a benefit by a defendant

from a plaintiff and retention of the benefit is inequitable, absent reasonable

compensation," while "a contract implied in fact arises 'when services are performed by

one who at the time expects compensation from anther who expects at the time to pay

therefor.'" *Heefner v. Cornell* (*In re McKim*), 606 N.W.2d 30, 32 (Mich. Ct. App. 1999)

(quoting *Hall v. Mordy* (*In re Lewis*), 423 N.W.2d 600, 603 (Mich. Ct. App. 1988)).

27

Even accepting Plaintiff's dubious legal premise that either of these doctrines can bind a non-party to an enforceable contract executed by other individuals, the factual predicate of Plaintiff's unjust-enrichment and contract-implied-in-fact claims is far from undisputed. Plaintiff depends upon its allegation that Farouk was a "silent partner" with an undisclosed ownership interest in AIA One and AIA Two. But, the only documented evidence implying Farouk's involvement in the franchises is AIA One's and AIA Two's periodic use of the PGI bank account, including for the payment of the initial franchise fees. Otherwise, Plaintiff relies entirely on Farouk's deposition testimony that he had an undefined "partnership" with Amanoail that related to the insurance agencies and resulted in his investment of approximately $500,000 in Amanoail's business ventures. While these facts generally suggest that Farouk may have been involved in the Advasure franchises in some capacity, they fall short of demonstrating that he had a "one-third ownership interest in AIA One and AIA Two," (Br. Supp. Pl.'s Mot. Summ. J. 31), let alone that he should be held fully accountable for the contractual obligations undertaken by AIA One and AIA Two in Franchise Agreements that he did not sign.

Plaintiff also maintains that Farouk tortiously interfered with its business relationships with AIA One and AIA Two. The elements of tortious interference with a business relationship are (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the defendant, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the plaintiff. *Dalley v. Dykema Gossett*, 788 N.W.2d 679, 696 (Mich. Ct. App. 2010)

28

(quoting *BPS Clinical Labs. v. Blue Cross & Blue Shield of Mich.*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996)).

To show that Farouk intentionally interfered in its business relationship with AIA One and AIA Two, Plaintiff alleges that the agencies stopped paying royalties and advertising fees once Farouk "discussed [with] Defendants that the insurance businesses would be more profitable after ceasing to make royalty payments to Plaintiff and [directed Defendants] to follow a course of action to cease royalty payments." (Br. Supp. Pl.'s Mot. Summ. J. 34.) In contrast, Farouk testified at his deposition that it was in fact *Amanoail's* idea, as well as his ultimate decision, to stop payments to Plaintiff. (Farouk Dep. 43:9-44:3, 49:7-52:11, 95:18-99:11.) This is clearly an issue of material fact precluding summary judgment against Farouk on Plaintiff's tortious interference claim, just as the ambiguous nature of Farouk's role in AIA One and AIA Two preclude summary judgment on Plaintiff's unjust-enrichment and implied-in-law-contract claims.

### E. Costs and Attorney's Fees

Finally, Plaintiff requests an award of costs and attorney's fees under both the Franchise Agreements and the Lanham Act. In light of the decision to deny Plaintiff's motion for summary judgment on all other counts, the court is obviously in no position to award attorney's fees to Plaintiff as the "prevailing party" in a dispute involving the Franchise Agreements, (*see* AIA One Franchise Agreement § 15.3; AIA Two Franchise Agreement § 15.3), or because Defendant committed malicious, fraudulent, wilful, or deliberate infringement, *see Audi AG v. D'Amato*, 469 F.3d 534, 551 (6th Cir. 2006) (quoting *Eagles, Ltd. v. Am. Eagle Found.*, 356 F.3d 724, 728 (6th Cir. 2004)) (construing 15 U.S.C. § 1117(a)). The propriety of awarding attorney's fees and costs

can only be determined upon the resolution of Plaintiff's substantive claims, all of which

depend upon disputed issues of material fact.

## IV.  CONCLUSION

For the foregoing reasons, IT IS ORDERED that Plaintiff's motion for summary

judgment [Dkt. # 72] is DENIED.

 s/Robert H. Cleland\
ROBERT H. CLELAND\
UNITED STATES DISTRICT JUDGE

Dated:  April 19, 2012

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, April 19, 2012, by electronic and/or ordinary mail.

 s/Lisa Wagner\
Case Manager and Deputy Clerk\
(313) 234-5522